Good morning, may I please the court. My name is Rignal Baldwin and I represent the appellant during her time at the University of Maryland as a Ph.D. candidate in the chemical physics department. Ms. Luskin had begun studying to get a Ph.D. in chemical physics with a concentration in dark matter. It is an overwhelmingly male and extremely competitive program within the University of Maryland. She was one of the few women in the chemical physics department at the University of Maryland. During her time there, she was accosted essentially by a fellow student that she did not know who demanded to know why it was that she was excluding him, why it was that she was paying attention to other individuals, and she was left baffled and quite concerned. But at this point, there was no signal that the behavior was motivated by her gender. It seemed like the student who had accosted her was simply disturbed in some way. When did this signal come that the behavior was motivated by her gender in your view? In my view, it begins with the text messages. And I believe that the — So in May? Yes. The — what Ms. Luskin described as the flood of text messages and University of Maryland — Can you put that for me in the context that she's making several reports to the university? And when was — when — what — that was the trigger of which report? The fourth? That was the trigger of the second report. The first report related to an outburst that he had with Ms. Luskin and several other students when he believed that they were making fun of him. And I believe that the text messages are found at 570 — excuse me, 574 in the joint appendix. And I believe that if one reads the text messages, the male student being the white, it becomes very apparent he is commenting on her boyfriend, on her relationship status, on her ring. What are you talking about now? The text messages. Where is the text message? The text messages begin at Joint Appendix 573, and — Well, when she reports about the second incident, it's JA 556. So the second incident is before that. The second incident is April 12th, 2018. Yes. And she was cornered alone in her office. Right. I think that's — The third incident is May. I apologize, Your Honor. I believe I transposed the two events. In any event, her initial report went to the — what is called the Beta Team. The Beta Team is a nondisciplinary body that essentially looks out for students who are in some sort of — But what — and you're welcome to do this any way you want to. But when do you think that the university became liable because it was not properly responsive to her complaint? When she — In responding to which complaint? When Ms. Luskin returned to the administrator of the Beta Team and was then sent to the University Counseling Center, she was directed to the Title IX office, which is how it's commonly known, to file a report of harassment based on gender because the counselor clearly saw that it was gender-based behavior. The university initially sent the male student a letter saying, you are accused of sexual misconduct. It is abundantly clear. At this time, the director for the Title IX office and the non-harassment disciplinary office was the same person. And this — and this complaint was initially treated as a sexual harassment complaint. It was then changed in contravention of the clear language in the policies relating to sexual misconduct that UMD abides by. And it was dealt with as a disciplinary matter in the way that a personal dispute would be done. For example, two roommates who do not get along. And the response to that was no contact? No. A no-contact order, Your Honor, was issued. But a no-contact order at the University of Maryland does not mean no contact. It means no communication. So unlike a peace order, which she was given by the district court, it does not prohibit the male student and Ms. Luskin from being in the same room from — That's fine. Okay, I understand that. So what — was it possible that she also would have gotten, as her relief, a no-contact order if it had gone through the group that you thought it should go through? She — the Office of Student Contact — excuse me, Conduct is the body that grants no-contact orders. I don't understand. What could the Office of Civil Rights and Sexual Misconduct have done? Could it have issued a no-contact order? It could have requested, and it did request, a no-contact order, what they call a no-contact order, from the Office of Sexual Misconduct. And that no-contact order did issue. He was prohibited from communicating with her. Okay. So that's what happens with the third incident. So is the university somehow liable for being, under the law, not responsive in this — to the third incident? Well, I believe at that point, yes. Yes. Well, I thought you just told me that the group that you thought it should go to, the Office of Civil Rights and Sexual Misconduct, can direct a no-contact order. Can request a no-contact order. Okay. It could request one. But she got it. She got it by complaining directly to the Office of Civil Rights and Sexual Misconduct. At that time, the individual who was administering this changed it from a Title IX complaint to a simple discipline complaint. There was no Title IX investigation. There was no Title IX hearing. There was no finding of facts. There were none of the procedural safeguards. So you're actually speculating — you're placing your emphasis on the way in which the order was routed to whatever university or body or community was routed, rather than on the response of the university as a whole? No, Your Honor. And I appreciate the direction. Because our claim is the district court found that the harassment was indeed severe. There was enough evidence in the record that it was severe and pervasive, and yet found that even though Ms. Luskin dropped out of the program, moved across the country, and restarted the program in California, there was no concrete negative effect on her access to educational opportunities, and actually no denial of equal access to educational opportunities. And I think that the idea that it could meet the elements of severe and pervasive, and that a student would seek mental health treatment based on this, would take a master's in chemical physics, which is equivalent to going to law school and leaving with a master's. It's not a degree that has any market value. And leave the university. Well, I mean, it is a master's in chemical physics. There's no attendant job for that. I mean, I'm not sure how this argument helps you, but go ahead. Okay. The reason that she took — pervasive and that it impacted her education, we still need to — you still need to get over the hurdle of how the university's response was clearly unreasonable. I — Am I right about that? Yes, absolutely. Okay, so how do you get us there? So the district court focused on the administrative procedures that this — that the school followed. Well, this is exactly what you were focusing on. So it's understandable why the district court would do that. Remember our whole discussion? You were just going about it. It had to be one department, not the other. I understand, Your Honor. And there are many ways to have a reasonable response to sexual harassment that leads to gender discrimination. What they did was grant a no-contact order and essentially leave her to her own devices to set up accommodations with individual professors, which she did. That — that — so if a no-contact order is issued and a student is acting violently, screaming, hands in pockets, has come by a tiny office to berate Ms. Luskin about having reported him, then — then — then there has to be some action other than what is essentially some — some form of secret — double-secret probation where he was told, well, if you do it again, then you will be in real trouble. So he — he does something which is clearly meant to intimidate this female student. He — he continues on that course of conduct. He is — Well, I mean, the Davis decision says the question is one of deliberate indifference. Right. And you may disagree with what — with what office they reported it to and how it was routed. And, of course, I think — I mean, I can see a lot of reasons why this would be funneled through student misconduct rather than the — oh, well, rather than the sexual misconduct. But if there's a deliberate indifference standard, even without getting into deliberate, I don't understand where there was indifference at all. You're having two different contact orders and you're talking to the professor. And then when there was a violation of the no contact order, further disciplinary steps were taken. I don't understand why there was a — how there was indifference, much less deliberate indifference. It seems to me there was deliberate attention paid to what is a very unfortunate problem. I believe that when Ms. Luskin made her report to the Title IX office and the intake individual, the person — the only person in that office looked her in the face and told her — and this is at — this is in her deposition at JA-692 — told her that she had to go to the district court because there was nothing that he could do for her. And she had just been essentially threatened with angry, violent behavior in her office and then followed by that same individual as she walked across campus to report the behavior that he had just committed. I think that saying that someone is obsessed with you and threatening you and making it — and I'm not talking about the feeling unsafe. I mean physically unsafe. She was reasonably in fear for her physical safety. When the university says to you — I get you to this extent. I think it's a very unfortunate problem, and it was very — it was important that the university be responsive here, but I don't understand how you can say, for example, just to take one part of a larger response, if the university was indifferent because when the no-contact order was violated, the university barred C.H. from attending classes and entering academic buildings and labs and it placed him — sanctioned him, placed him on disciplinary probation. And it says, at least the opposing counsel indicates, after these actions actually proved successful because Luskin had no contact or interaction with C.H. after he violated the no-contact order. But what they're trying to do is one thing after another after another, and you may not agree, but how is it indifferent, much less deliberate? That's the standard we're talking about. We're not talking about what's — Ineffectiveness. And the Supreme Court's definition of deliberate indifference as clearly unreasonable. I do believe that it is clearly unreasonable for there to be discriminatory behavior based on a student's gender. So this action from this male student towards my client was based on her gender. And the school will say, we're going to tell him to stop. And it's not lewd comment. It is angry, violent, intrusive behavior. Nearly asking a student to behave himself, and then when he doesn't, barring him from campus until he meets with the Title IX coordinator. It was a day or so. It was not a stretch of time. She still saw him on campus. She still ran into him. And ultimately she believed that the behavior was escalating, because it was, and the university's response was not escalating. He was told not to contact her. He violated that. And he was told again not to contact her. That was all. And I believe that that is clearly unreasonable given the known circumstances. I'm sorry. I've gone over my time. Thank you. May it please the Court. Katherine Bradley for the University of Maryland College Park. This Court should affirm the district court's decision granting summary judgment to the university, because viewing the facts and evidence and inferences in a light most favorable to Ms. Luskin, no reasonable juror could find that the university was deliberately indifferent to sexual harassment, and no reasonable juror could find that CH's conduct deprived Ms. Luskin of access to educational opportunities or benefits. Far from being deliberately indifferent. Sotomayor, you added a clause, an and. And if we should find that they did deprive her of the education, whatever the end of the and sentence was, where does deliberate indifference go? So I stated that because that was what the district court found, that she, the university, CH's conduct did not deprive her of educational opportunities and benefits. Even if you find that it did deprive her of educational opportunities and benefits, the next step in the analysis is whether or not the university's response was deliberately indifferent or clearly unreasonable. And there's, so those are separate parts of the analysis, and certainly we do not think that the university's response was deliberately indifferent. What was the university's response after the April incident when he cornered her in the office? After the April incident, Ms. Luskin and a male student reported the conduct to the beta team. And prior to that, they had asked that the report be confidential. I believe at that point the beta case manager reached out to five of CH's professors to ask if they had concerns about CH, and none of them did. And that was the time when the university permitted Ms. Luskin to move offices so that she would no longer be in contact or share an office with CH. And at that time, she and the male student had requested that the report be confidential. Is that what you said? I know that at the time of the February incident, which definitely didn't target Ms. Luskin in particular, that Eli Mizrachi had asked that that be confidential. I'm not entirely sure if they had asked at that point that the April conduct be confidential, but that was, again, you know, Ms. Luskin did feel threatened but it was a conversation in a shared office in which CH felt angry and angrily expressed his exclusion. He didn't follow her and he didn't say anything sex-based at that time. And they both, they supported the beta team and the police. And he didn't follow her? Because I thought opposing counsel said he did follow her across campus to where she went to report it. Those that, not in April, he didn't follow her at all in April. In opposing counsel, in the record, their testimony that he circled at a distance when Ms. Luskin and others went to go report the October 15 conduct, violation of the conduct order. Two incidents later. Opposing counsel also said something like it was only a day or so that they banned him from campus or banned him from classes or something. Could you respond to that and put it in context? I mean, the university did more than just ban him for a day or so, correct? Right. So after he violated the no contact order in October 15, 2018, the university immediately contacted him and CH, told him he was barred from attending classes and entering academic buildings, ordered him to meet with Dr. Goodwin, which he did, and he met with Dr. Goodwin and Sergeant Mabel, and then he was ordered to be evaluated by a psychiatrist, which he also did. Then Dr. Goodwin implemented a safety plan so that CH would not come into contact with Ms. Luskin, required that he take classes that he shared with her online, barred him from- When was all that? That was in October or in May? October. Right. And in May, two days after the May incident, no contact order was put in place then, wasn't it? Right. May 10. So the text messages occurred on May 8. She reported to the OCRSM, the Office of Civil Rights and Sexual Misconduct, on May 9. That is when the director of that office, Ms. Carroll, conducted an initial assessment and determined that the conduct was not sex-based and did not fall under the sexual misconduct policy. So she referred it to the Office of Student Conduct, but at the time she referred it, she also asked for a no-contact order. And the Office of Student Conduct is the only office that has the authority to issue no-contact orders. And then they did issue it. So even if you put it to the Office of Civil Rights and Sexual Misconduct, in order to get a no-contact order, they had to go to the Office of Student Conduct?  It has to be. That's the only office authorized to issue those orders. So it has to be at least routed through that office to get the no-contact order. And then at that time, after the May 9 incident, or the May 8 incident, the no-contact order was issued on May 10. And then Dr. Goodwin met with CH for over an hour to explain the no-contact order, to explain Ms. Luskin's complaint. And CH also met with Dr. Zacker, who is the AVP of Student Affairs, to address Ms. Luskin's complaint. And CH admitted to sending the text messages and agreed to comply with the no-contact order. And after that, the university also made professors, their shared professors, aware of the no-contact order and permitted Ms. Luskin to take exams and complete projects apart from CH. This action, these responses by the university, were not clearly unreasonable. And the Supreme Court, as we talked about in Davis, said that an educational institution can be liable for sexual harassment, being deliberately indifferent, only when its response is clearly unreasonable in light of the known circumstances. The Davis court made clear that that can be decided on a motion for summary judgment. And to the extent that Ms. Luskin argues otherwise, that conflicts with Davis. Here, the university responded to all of Ms. Luskin's reports in a manner reasonably calculated to end the unwelcome behavior and maintain Ms. Luskin's access to her education. Ms. Luskin argues that the university was deliberately indifferent by not applying the sexual misconduct procedures and instead applying the regular student conduct procedures and policy. But as we argued the brief, that classification was not clearly unreasonable. Multiple university administrators, Drs. Goodwin and Zacker and Ms. Carroll, all agreed that CH's conduct was not based on sex. In addition, male students, Donnie Pearson and Eli Mizrachi, had also felt targeted by CH. And second, as we've been discussing, the classification as regular student conduct and sexual misconduct did not affect the impact, did not impact the effectiveness of the university's response as a whole. And that's what matters in Davis. It's not — it doesn't matter which office it went through or whether it went through the Title IX procedures. It just matters whether the university's response was clearly unreasonable in light of the known circumstances. In addition, the university — Sotomayor's directly speak to different offices? It does not speak directly to different offices. But there are cases that make clear that a — that failure to follow Title IX procedures or Title IX regulations is not indicative of deliberate indifference, including Gebser, I believe. I guess you'd made the point that the Title IX procedures can be very bureaucratic and the student — the Office of Student Misconduct would still have jurisdiction and can move in a more expeditious and informal manner to grant effective relief. The university — that point was made — I mean, Dr. Goodwin testified that, again, the response was largely the same and it was faster under the OSC rules. There wasn't — didn't really even need to be an investigation because C.H. admitted to the conduct. But if this — if they had viewed that this was really sexual misconduct, they would — you know, they would have routed it through the Title IX procedures, no matter how much more bureaucratic and long, you know, difficult that was. Ultimately, the response, again, was largely the same as it would have been. They issued the no-contact order. The university talked to the parties and the professors to ensure that they remained separate and apart. And they also implemented various protective measures, including — you know, Ms. Luskin talks about the university left her to her own devices to set up accommodations. The way accommodations work is that you request them, and that's what she did, and they were approved in every case. I think there was one case where she wanted to have an accommodation or she wanted to take a final exam apart from C.H. That was denied, but instead she got assurances that a professor was going to be present for the entire time, and there were no issues. Can I ask you about the fourth incident? Because that was the one that really nobody talks very much about. But — so there's this note. He's under the no-contact order, and he is angry, and he confronts her. And so she goes to administration, and the Title IX offices recommends that she seek a peace officer from the Prince George's County Court. That doesn't sound to me like — you know, you have to — that's not exactly — a person receiving that might well think that the university was just putting this off on a different agency or a different — you know, we can't do anything for you, so go somewhere else. Can you speak to that? Yes. My understanding was that Mr. Nelms told Ms. Luskin that she should seek a peace officer — this peace order if she wished to have protection off campus as well as on campus. So, you know, the university didn't have control over what would be going on off campus. And in addition — Did he say anything like, and we will support you on that? Yes. I mean, it was recommended by him. So, you know, and she followed that recommendation. Well, I understand that. And they did support him on that. But I mean, does the police — did the police know that? She knows that they're supporting her on that. Do you understand what I'm saying? Did the police know that? Is that what you said? Oh. Did they know that the university was supporting her in seeking this? Because it seems to me if I am — or my child is suffering this and they go to the university administrators and the university administrators say, well, go to the police, that doesn't seem to me to — maybe that's good advice. It's not — oh, I'm sorry. Go ahead. That's not the only thing Mr. Nelms did is — but he did suggest that she could do that to obtain protection off and on campus. She also reported the conduct to the police. And when it was reported to the OSC, you know, immediately they took action in terms of barring him — you know, told him he couldn't go to class, couldn't go on campus, couldn't go to this academic building until he met with Dr. Goodwin. And there's a portion of the record where Dr. Goodwin was asking if, you know, do you know if he threatened her? If so, I would like to do an interim suspension. But there was no evidence, it appeared, that he had actually threatened her. So he, you know, didn't do an interim suspension at that time. That's on JA-724. So, you know, the conduct — even if you just look at the conduct at issue here, yes, it's angry, it's unwelcome, but it's not clearly threatening and it's not clearly severe and pervasive and objectively offensive, such that it interfered with her educational opportunities or benefits. Well, does she ever assert, and I couldn't find this, that the advice to get the peace order was inappropriate or wrong or impossible or she couldn't do it or not responsive to her needs? As far as I know, she does not assert that. Okay. And the university, after they got the peace order and were aware of it, worked to make sure that it was — you know, that everybody followed it. CH ultimately accepted a final peace order and, you know, told Dr. Goodwin and others and Sergeant Mabel what the terms of the final peace order was, committed to complying with it, and they, you know, worked together to ensure that they complied with it. The peace order is to handle things outside of campus. That's my understanding. Because that's why you had to go to the police for it. He — As opposed to what the university was doing within the campus. My understanding is that she went to the police, to OCRSM, and then they spoke — after speaking to OCRSM, went to the district court to obtain a peace order. To the federal district court? No. To the — I believe the state district court. State district court. Yes. Maryland State District Court. So the university's actions here were reasonably calculated to end the unwelcome behavior and maintain Ms. Luskin's access to educational benefits, and they were successful in doing so. After the October 15 incident, when he violated — when CH violated the no-contact order, there was no — there were no further interactions between the two, no further issues for about seven months. And Ms. Luskin did — the district court properly also found that the — CH's conduct did not deprive Ms. Luskin of access to her education. I mean, Ms. Luskin argues that CH's conduct had a concrete negative effect on her education because she left the program with a master's degree. She voluntarily left about seven months after the last incident, and that was after finishing both the fall 2018 semester and the spring 2019 semester successfully with good grades. And she also decided to re-enroll in the university's Ph.D. program. She made that decision in the fall of 2019. I believe she re-enrolled sometime in 2020. She's currently still enrolled in the Ph.D. program at the university. The cases in which courts have found that — and sent to the question of the jury about whether voluntarily — or leaving a program creates an issue as to deprivation of education access, like Zeno in the Second Circuit and Vance in the Sixth Circuit, those had ongoing harassment until the person left the program. She also argues that she experienced anxiety and fear on a regular basis, but she doesn't describe how that anxiety and fear had a concrete negative effect on her ability to participate in education program activity, like, for example, causing her to have to miss classes due to the anxiety and fear. And finally, she also argues in her reply that she had to switch offices and change the way she took exams and gave presentations, but it's not clear at all how those negatively affected her access to her education, as those were measures designed to ensure that she had continued equal access to her education, and those are things that the university implemented. Because no reasonable jury could find that CH's conduct deprived Ms. Luskin of access to educational opportunities or benefits, the court can affirm on that additional ground that the district court found. The court can also affirm on the alternative reasons that CH's conduct was not severe, pervasive, and objectively offensive and was not based on sex. Cases that have severe conduct, usually it's physical conduct like assault, battery, sexual assault. Of course, none of that's present here. But if there's severe verbal conduct, it's verbal threats of physical injury, derogatory, hateful comments like those in feminist majority, or profane, humiliating, degrading comments like those from the coach in Jennings. It's usually widespread verbal conduct. It's persistent, hundreds of messages or comments or daily interactions. None of that's present here. And Ms. Luskin did not actually ask CH to stop contacting her or stop speaking with her until after she reported it to the OCRSM on May 9. And that was when the no-contact order was issued on May 10. There's no sex-stereotyped or sex-based comments, no daily messages or phone calls. He didn't follow her around. Well, eventually he's talking about her boyfriend, and so I'm not so sure that you could say there are no sex-based comments. I would say that it's unreasonable to infer that just because he meant he – after she voluntarily brought up her boyfriend, she asked a couple of questions about their relationship. This is not a case like those where a Title VII hostile sex-based harassment, like Livingston v. Marion Bank & Trust. It's not like those cases. But you said there was no – I thought you said that there was no sexual contact here or no element of sexual harassment here. And I think there is later on, as the case goes on, in the contacts between the two of them, there is some element of it. The cases that find – I mean, I didn't see anything cited by Ms. Luskin. The cases that find that there's actual sex-based conduct or that it's a jury question, that he cited about non – the cases that were cited were all like Title VII cases in which you had oftentimes an employer asking questions of an employee. So, like, this is different from a case where you have a supervisor asking sex-based questions about his employee about the sex life with her husband and things like that. These are two peers, and, again, there wasn't anything about sex. It was about – he did ask questions about her boyfriend, but that doesn't indicate that his contact with her was due to her sex or due to sexual desire. Well, I don't know. Things may have changed since I was young. But somebody asked you if you had a boyfriend. That indicated to me that they had some interest in you that was not thoroughly platonic. Well, Your Honor, I will respectfully submit that he didn't actually ask if she had a boyfriend. He did make a comment about her ring. I don't think I'd quarrel about that. The record is what it is. You have to live with it just as they do. But, again, this Court should affirm the district court's grant of summary judgment because – for the university, because viewing the facts and evidence in the light most favorable to Ms. Luskin, no reasonable juror could find that the university was deliberately indifferent. Thank you. Thank you. Mr. Ballard. Thank you. I want to address the no incidents for seven months. The individual was in Europe at the time. He wasn't. The plaintiff. And so, you know, the school cannot point to his voluntary absence from campus as evidence that the measures that they have instituted are effective. I would also, on the question of her interaction with Mr. Nelms, again direct the Court to JA 691 through 694. She has been, in violation of a no contact order, in the cell phone proof basement of a laboratory. She has just had an individual burst into her office and start angrily talking to her through another individual who was present with his hands in his pockets. He then follows her as she goes to report him to the police. When she arrives at Mr. Nelms' office, according to her, and this is the evidence that's in the record, he said, you know, you're really in danger and you can have a peace order hearing and get some protection like something along the lines of that. That's going to be something that will protect you more than whatever we can do here. Well, that's not, the school has the authority after someone violates a no contact order and then follows someone in a clearly intimidating manner to say, you're barred from campus. You have to do online. You have to do certain things. It was Ms. Luskin who had to change offices. It was Ms. Luskin who had to, and counsel is correct. She is enrolled in the University of Maryland in California. She is studying at the Joint Propulsion Laboratory for NASA. That is where she is doing her work. She did re-enroll with the University of Maryland. It is extraordinarily difficult to begin a Ph.D. program at one university in such a specialized topic and move to another. She, on her own, found a research partner, a topic, got funding for it, re-enrolled, moved to California, and resumed her studies. I think that the question of deliberate indifference and whether or not something is clearly unreasonable is whether or not it is essentially a half-hearted attempt, as the Court found in Feminist Majority, that is not effective. I think that there has to be something more than saying. The fact that a response is graduated and sort of goes step by step after the initial no contact order has proved to be less than effective, but the fact that a response is graduated doesn't mean that it is deliberate indifference because most universities would respond to these kinds of things in a graduated manner. I believe that progressive discipline would be an appropriate response, but it has to be progressive. She went from a no contact order to, hey, you need to go to the police because we can't do anything from you. There was no change. The university took him out of school until he had a meeting and made a note in his file. That is administrative. It's essentially window dressing, and if universities are able to hand people pieces of paper and take no further action when they are acting in a manner that I fundamentally believe would deny Did the university talk to professors to make certain that they were aware of the no contact order? She talked to professors. The beta team initially inquired to his professors as to whether or not he was okay. So the initial response was towards his well-being, not hers. Or his mental state. I mean, if they had never contacted him, you would be telling us, well, they weren't dealing with the root of the problem. They were just focusing on the poor victim. But this is not a case. Look, you cannot require that a university prevent all gender discrimination. It is not going to happen. But if there is violent gender-based behavior, threatening behavior, scary behavior, you have to do more, in my mind. I believe that it is clearly unreasonable to simply say, well, we told him to stop. He broke that. So we told him to stop again. That is effectively what happened, and that is why she left the campus. All right. Thank you, counsel. We'll go down and talk to her. We will shake hands, and then we will adjourn court for the day. Well, I guess until this afternoon. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Stephanie D. Thacker, Diana Gribbon Motz